Filed 6/25/21  P. v. Beltcher CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>TANIKA BELTCHER,<br><br>    Defendant and Appellant. | A157083<br><br>(Alameda County<br>Super. Ct. No. 17CR000092) |

A jury convicted Tanika Beltcher of second degree murder for the killing of Tamu Myers on December 28, 2016 and possession of a firearm by a felon.  The jury found true the allegation that Beltcher personally and intentionally discharged a firearm causing death and rejected her claims of self-defense.  The judge sentenced her to a total term of 25 years to life.  Beltcher appeals asserting there was *Batson-Wheeler* error, instructional errors, errors in imposing certain fines and fees and error in denying her counsel's request for a second closing argument, or surrebuttal.  We find no error, and we therefore affirm.

1

# BACKGROUND

In 2018, the Alameda County District Attorney filed an information charging Beltcher with murder (Pen. Code § 187, subd. (a)[1]) and possession of a firearm by a felon. (§ 29800, subd. (a)(1).) The murder charge included an allegation that Beltcher personally and intentionally discharged a firearm causing death. (§§ 12022.7, subd. (a) and 12022.53, subd. (d).)

For purposes of this appeal, it is not necessary to provide a detailed summary of the evidence presented at trial. In essence, a former roommate of Beltcher's, Ursula Johnson, who shared an RV with Beltcher and her boyfriend, Thompson, in West Oakland, testified that she awoke to the sound of two gunshots and saw Beltcher holding and shooting a gun through a hole in the trailer's screen door. Johnson peeked her head out the door and saw somebody laying on the ground. She went to check it out, and it was Tamu Myers. Myers was gasping for air, said "can't breathe," and was sweating and shaking. Johnson further testified that she heard Beltcher arguing with Myers shortly before the shooting, and did not see a knife or other weapon on or near Myers as she lay on the ground. On cross-examination, she testified that immediately after the shooting, Beltcher told her that Myers had come at her with a knife.

Prior statements Johnson made to police were played for the jury, in which Johnson said she did not see Myers near the door to the trailer at the time of the shooting, and that, when someone at the scene of the incident said Myers had been shot, Beltcher said, "Oh God—oh for real," and, "Well, good." Johnson also told police that Beltcher was nonchalant after the shooting and that Thompson, screamed at Beltcher to call 911 because she wasn't doing

---

[1] Except as otherwise specified, references to sections are to the Penal Code.

anything.  Johnson told police that Beltcher had shot the gun on two prior occasions to scare off different men and that there was talk in the neighborhood about Beltcher being gun happy.

Beltcher testified on her own behalf.  She said that she was inside the trailer sitting by the door eating fried ribs and taking a hit of crack cocaine before Myers arrived.  Thompson and Johnson were lying down and resting. Beltcher heard the gate opening and someone said, "It's Tamu," so she knew Myers had arrived.  She and Myers then argued, Myers attempted to come in the trailer while Beltcher held the door shut, and Myers tried to stick her through the screen door with a knife.  Beltcher grabbed a gun from her chair. Myers backed away and, still holding the knife, assumed a threatening posture that Beltcher interpreted as challenging Beltcher to a fight.  Beltcher was scared and told Myers to leave, and when she didn't, fired a warning shot down toward a pallet on the ground.  When Myers charged at her with the knife again, Beltcher shot at Myers.  She testified that she was scared for her life and shot at Myers to defend herself.  After she shot, she heard a thump when Myers hit the trailer.  She did not want to kill Myers.  After the shooting, a man named Rainbow took the gun, which belonged to Thompson. She talked with police officers and learned that Myers died at the scene.  By then, she had come down from her high, though not all the way down.

Multiple statements Beltcher made on the night of the incident, to 911 dispatchers, police officers and investigators, were used in cross-examination or played for the jury.  Beltcher admitted she lied and changed her story repeatedly in these statements.

Testimony of a police evidence technician established that no knife was found at the scene.  Nor did police find bullet strike marks, bullet fragments

3

or bullet casings in the vicinity. Myers died at the scene as a result of gunshot wounds to the back of her head and her left arm.

At the conclusion of the 12-day trial (excluding motions in limine and voir dire), the jury deliberated for about three and a quarter hours before reaching a verdict. It found Beltcher not guilty of first degree murder, guilty of second degree murder and guilty of possession of a firearm by a felon, and found true the allegation that she personally and intentionally discharged a firearm causing death.

Beltcher received a sentence of 25 years to life, including 15 years to life for second degree murder and 10 years consecutive for personal use of a firearm under section 12022.53, subdivision (b). The court exercised its discretion under section 1385 to strike a 25-year enhancement under section 12022.53, subdivision (d). The court imposed various fines and fees.

## DISCUSSION

### I.

### *Belcher's Batson-Wheeler Challenge*

During jury selection, Beltcher brought a motion under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*)[2] and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), arguing the district attorney had excused the only prospective African-American juror in the jury panel because of his race, resulting in no African-American jurors being on the jury. Beltcher contends the trial court erred in denying his motion. We conclude the trial court did not err.[3]

---

[2] Overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 173.

[3] Beltcher is African-American, as were the victim and the key prosecution witness.

### A.  Legal Standards

As discussed in *People v. Gutierrez* (2017) 2 Cal.5th 1150:

"At issue in a *Batson/Wheeler* motion is whether any specific prospective juror is challenged on account of bias against an identifiable group distinguished on racial, religious, ethnic or similar grounds. [Citation.] . . . [¶] When a party raises a claim that an opponent has improperly discriminated in the exercise of peremptory challenges, the court and counsel must follow a three-step process.  First, the *Batson/Wheeler* movant must demonstrate a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  The moving party satisfies this first step by producing ' "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." ' [Citations.]

"Second, if the court finds the movant meets the threshold for demonstrating a prima facie case, the burden shifts to the opponent of the motion to give an adequate nondiscriminatory explanation for the challenges. To meet the second step's requirement, the opponent of the motion must provide 'a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.]  In evaluating a trial court's finding that a party has offered a neutral basis—one not based on race, ethnicity, or similar grounds—for subjecting prospective jurors to peremptory challenge, we are mindful that ' "[u]nless a discriminatory intent is inherent in the prosecutor's explanation," ' the reason will be deemed neutral.  [Citation.]

"Third, if the opponent indeed tenders a neutral explanation, the trial court must decide whether the movant has proven purposeful discrimination. [Citation.]  In order to prevail, the movant must show it was ' "more likely

than not that the challenge was improperly motivated." ' [Citation.] This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness. [Citation.] At this third step, the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, ' "among other factors, the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." ' [Citations.] To satisfy herself that an explanation is genuine, the presiding judge must make 'a sincere and reasoned attempt' to evaluate the prosecutor's justification, with consideration of the circumstances of the case known at that time, her knowledge of trial techniques, and her observations of the prosecutor's examination of panelists and exercise of for-cause and peremptory challenges. [Citation.] . . .

"We review a trial court's determination regarding the sufficiency of tendered justifications with ' "great restraint." ' [Citation.] We presume an advocate's use of peremptory challenges occurs in a constitutional manner. [Citation.] When a reviewing court addresses the trial court's ruling on a *Batson/Wheeler* motion, it ordinarily reviews the issue for substantial evidence. [Citation.] A trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' [Citation.] What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual. '[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. . . . If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have

6

been shown up as false.' " (*People v. Gutierrez, supra*, 2 Cal.5th at pp. 1158-1159.)

### B. Voir Dire and the *Batson-Wheeler* Motion

Prospective juror A.B. was one of the first of 18 prospective jurors the trial judge called. A.B. was not yet present in the courtroom, however, and the court passed him over. Counsel and the court proceeded with voir dire. A.B. arrived at some point and was seated in place of another prospective juror the court had excused for cause. After counsel questioned A.B., the court announced that peremptory challenges would commence.

The prosecutor exercised peremptory challenges to two jurors and passed twice when the defense exercised its third and fourth challenges. After the prosecutor and defense counsel questioned the six prospective jurors who were to replace those previously excused, the prosecutor exercised a peremptory challenge to excuse A.B. The defendant made a *Batson-Wheeler* motion.

In chambers, the court entertained the motion, found a prima facie case had been made and stated the burden was shifted to the prosecution. The prosecutor explained her reasons for excusing A.B.:

"Your Honor, primarily Mr. [A.B.] was the juror who was significantly late this morning, so he did miss a significant amount of voir dire, albeit not all from myself, but he was here for [defense counsel]. ⋅ He got here about 10:30 this morning.

"In addition to that, after our first break this morning, he was a little bit late, only a minute or two coming back into the courtroom, resulting actually in after the Court excused Mr. H[.] for cause, Mr. [A.B.] didn't even sit down in between entering the courtroom and having to go into Juror Seat Number 13.

"I feel uncomfortable with his kind of timeliness, frankly, as a starting point particularly given that he works for the City of Oakland. · I don't think that it's job related and instead I find it to be disconcerting in that it shows an insufficient amount of respect for the other jurors' times and to the process.

"What's more, during the break that we took this afternoon, I had an opportunity to go through his questionnaire once more and I didn't follow up with him too in depth, but I did ask him about his unpleasant interactions with police as well as his opinion about the criminal justice system. · He was not particularly forthcoming in those responses, but those in combination with his other responses in the questionnaire, including his kind of disturbing-the-peace citation arrest charge, did not have time to run him, nor did I try to. · But all of those things in combination are the reason under which I am excusing him.

"I hoped that this afternoon, kind of his perceived engagement in the process would change a little bit, however, his facial expressions both during mine as well as [defense counsel's] kind of questioning this afternoon has left me with reasons to excuse him on peremptory basis."

The court followed up by asking the prosecutor to refresh his memory about her question concerning A.B.'s contact with police, to which she responded:

"He indicated in his questionnaire that he had been charged with a disturbing the peace and that he appeared in court on that citation. · He also indicated with the, have you had any particularly favorable or unfavorable experience with any police officer, deputy sheriff, or other law enforcement, that he has had unpleasant interactions with police periodically.

8

"And with respect to, how do you feel in general about law enforcement officers, he indicated quote, they are necessary, albeit unpleasant to deal with.

"And then with respect to the criminal justice question, what are your feelings about the criminal justice system, he indicated, quote, structurally unfair towards people of color, end quote."

The court then asked defense counsel for any response. She responded:

"Yes. With regards to the timeliness, I was not aware of what time he arrived this morning. He's not—well, I have not noticed any other timeliness issues. I would say that's an issue for the Court, and that the Court could admonish him on that. I don't see that as a basis to excuse him or to overcome the prima facie showing. He said here in court, he said he has had unpleasant interactions with police, and he said that here in court. No questions were followed up about that. He did say that the system is unfair to people of color. A number of different jurors have said that. I think almost all of the jurors have said that the system is flawed.

"So he did not articulate anything specific that would set him aside from any other jurors."

The court then asked if the matter was submitted and found "that the District Attorney's motivations do not flow from racial bias" and denied the motion.

The following day, outside the presence of the jury, the court allowed the prosecutor to make a record on some matters related to selection of the jury. Among other things, the following colloquy ensued:

"[THE PROSECUTOR:] [¶] . . .[¶] Secondarily, I did put on the record yesterday my reasoning for excusing Mr. [A.B.], and I don't know that we noted on the record that he had been Random Juror Number 8, and we

passed him in our first 18 due to his tardiness. And I'm not sure if the Court or clerk or anyone had a notation regarding the time that he did arrive, but I wanted to make sure that that was on the record.

"THE COURT: Yes, that should be shown on the record. And just to be complete, I believe Mr. [A.B.] was the only African-American among the 12 at that time, and no further African-American has been seated to this point.

"[THE PROSECUTOR]: He was the only one of the 12 and he was the first peremptory that I used on a juror of that racial or ethnic background. Although, I would note for the record that two other peremptories were used prior to him individuals who were not of the same protected class, and I submit to the Court that there hasn't been a prima facie showing, however, I did appreciate the offering to put my reasons on the record.

"THE COURT: And I found a prima facie case—well, I won't go into it further, but I think it was sufficient to show a prima facie case."

### C. Analysis

Beltcher contends "purposeful discrimination is plainly evident" on this record. She argues that the prosecutor did not question A.B. about his untimeliness and that this shows that reason for excusing him was pretextual. She further contends the record does not show that A.B. was "very late at all," since "[i]f A.B. had arrived 'about10:30' as the prosecutor claimed, he surely would have been reprimanded by the trial court for being almost one hour late." Beltcher further contends the prosecutor admitted she was "not sure" when A.B. came into the court room, and A.B. said he had come in before the prosecutor discussed witness credibility, indicating "he was not terribly late." All of this, Beltcher contends, makes this reason for excusing A.B. "problematic and not supported by the record."

10

Beltcher also discusses the prosecutor's other grounds for excusing A.B., including his comments about the criminal justice system, his failure to be forthcoming about those when asked, and his citation for disturbing the peace, which Beltcher argues are not supported and pretextual because if those were genuine concerns the prosecutor would have inquired further about them. She argues that the prosecutor relied on A.B.'s questionnaire response to a question seeking his views about the criminal justice system and on A.B.'s response that the system is "structurally unfair towards people of color," and contends this "in and of itself is racially motivated and perpetuates the discriminatory use of peremptory challenges against people of color." She further contends that the prosecutor's failure to excuse other persons from the jury who expressed concerns about the fairness of the judicial system or had arrests show her concerns with A.B.'s experience with and concerns about the criminal justice system are pretextual.

We are not persuaded. We disagree with Beltcher's contention that the record does not support the prosecutor's assertion that A.B. entered the courtroom late on his initial arrival and after a break in the proceedings. The record shows that A.B. was not present when the clerk asked him and others in the first group of prospective jurors to take a seat in the jury box, and that as a result the court passed him over. Beltcher does not deny this, and did not deny it below. His trial counsel stated only that she was not aware what time he had arrived.

Instead, Beltcher argues that the record does not show that A.B. was "very late," that he "arrived 'about 10:30' as the prosecutor claimed" or that he " 'was significantly late.' " True, the transcript of the voir dire does not indicate precisely when A.B. arrived, and does indicate the prosecutor was not certain of exactly when he did so. But the record does reflect that jurors

11

had been instructed to report at 9:30 a.m., proceedings commenced at 9:40 a.m., and voir dire began at 9:45 a.m. with A.B. not present. Further, Beltcher did not dispute that, as a result of his being late, A.B. missed at least part of the prosecutor's voir dire, whereas he was present for all of the defense counsel's voir dire. Nor does Beltcher dispute that A.B. was late a second time, when returning to the courtroom after a recess. When the prosecutor made a statement to that effect during the *Batson-Wheeler* hearing, she provided significant detail; she said the result was that A.B. didn't even sit down before the court excused another juror (Mr. H.) and instructed A.B. to take his place.[4] Beltcher's trial counsel did not disagree with the prosecutor's assertion; she simply said she hadn't noticed it. (See *People v. Hardy* (2018) 5 Cal.5th 56, 82 (*Hardy*) [prosecutor's observations, even if not explicitly confirmed by the record, are permissible race-neutral ground for peremptory excusal, especially when they were not disputed in the trial court].) Based on these facts, Belcher's assertion that A.B.'s tardiness was of little consequence is unpersuasive.

Beltcher further argues that the prosecutor's failure to ask A.B. about his tardiness shows her concern about it was not genuine. We disagree. The prosecutor referred to A.B.'s tardiness several times during the voir dire, and A.B. did not explain or apologize. Further, A.B. was late twice, once in the morning and, after the prosecutor had already questioned him, again when

---

    [4] The prosecutor said A.B. was "a little bit late, only a minute or two coming back into the courtroom, resulting actually in after the Court excused Mr. H[.] for cause, [A.B.] didn't even sit down in between entering the courtroom and having to go into Juror Seat Number 13." The 15 pages of transcript covering the period from when the court resumed proceedings and when it instructed A.B. to take the excused juror's place indicate this second instance of tardiness on A.B.'s part was probably longer than the prosecutor recalled.

returning from the lunch recess.  As the prosecutor explained, she found his tardiness "disconcerting in that it shows an insufficient amount of respect for the other jurors' times and to the process."  The trial court implicitly found the prosecutor's rationale was plausible, and we agree.  Jurors who are late can miss important aspects of the proceedings, such as occurred here when A.B. missed parts of the voir dire.  Further, one juror's tardiness imposes on the other jurors as well as on the parties, witnesses, court and counsel.  Jurors who feel their time is being wasted may become impatient and frustrated, which in turn may undermine their ability to focus on the proceedings and to work collegially with the tardy juror during deliberations.  A prosecutor may "legitimately challenge a prospective juror whose behavior may indicate an inability to get along with other members of the panel." (*People v. Hensley* (2014) 59 Cal.4th 788, 805.)

Beltcher argues, however, that other bases asserted by the prosecutor demonstrate that she excused A.B. on racial grounds for several reasons.  She refers to the prosecutor's reference to A.B.'s questionnaire responses stating he had "[u]npleasant interactions w/police periodically," that police "are necessary, albeit unpleasant to deal with," that he had been charged with "disturbing the peace" and that he viewed the criminal justice system as "[s]tructurally unfair towards people of color."  The prosecutor indicated that a secondary reason for his peremptory challenge was a combination of these factors:  "What's more, during the break that we took this afternoon, I had an opportunity to go through his questionnaire once more and I didn't follow up with him too in depth, but I did ask him about his unpleasant interactions with police as well as his opinion about the criminal justice system. · He was not particularly forthcoming in those responses, but those in combination with his other responses in the questionnaire, including his kind of

13

disturbing-the-peace citation arrest charge . . . ." Beltcher contends that if the prosecutor was concerned about A.B. not having been forthcoming, about these issues, she "should have inquired further" and contends "[t]he 'not . . . forthcoming' reason is specious." She claims the failure to ask specifically about the disturbing the peace charge and failure to "run" A.B.'s criminal history show this reason was "pretextual."

The colloquy with A.B. on his unpleasant interactions with police and the unfairness of the criminal justice system was limited, but it is fair to describe him as not very forthcoming. This is particularly so in the following exchange on the subject of unpleasant interactions with police.

"[PROSECUTOR]: Okay. · You talked a little bit about law enforcement in your questionnaire, as did everyone. · You indicated that 'they are necessary albeit could be unpleasant.' · What do you mean by that?

"[A.B.]: Interacting with law enforcement.

"[PROSECUTOR]: Based on your personal experiences?

"[A.B.]: Yes.

"[PROSECUTOR]: So do any of those experiences, have they been so negative or so positive or so unpleasant that it would factor into your ability to judge their credibility in this courtroom?

"[A.B.]: No."

True, the prosecutor could have probed further, but, having asked three questions, the first very open ended, and received little information, her view that A.B. was not very forthcoming is plausible. Further, as our Supreme Court recently observed, the failure of the prosecutor to ask the juror about some of her concerns "is relevant but not particularly probative. 'A party is not required to examine a prospective juror about every aspect that might cause concern before it may exercise a peremptory challenge.' [Citation.] The

14

prosecutor did question the juror about some, although not all, of her concerns. Moreover, she had a lengthy and detailed questionnaire to review, and she heard questioning during voir dire by the court and defense counsel. 'Under these circumstances, we place little weight on the prosecutor's failure to individually or more thoroughly question a prospective juror before exercising a peremptory challenge.' " (*Hardy*, *supra*, 5 Cal.5th at p. 83.) This is especially true here because the prosecutor's primary concern was the A.B.'s tardy appearance at the outset and after the first recess at trial, not his views of, and interactions with, law enforcement.

Beltcher also argues that "comparative analysis . . . establishes the pretextual nature" of these secondary concerns about A.B.'s views about, and interactions with, law enforcement and criminal justice.[5] She points to several seated jurors who raised concerns about law enforcement or the fairness of the criminal justice system, one juror who had been convicted of

---

[5] "Comparative juror analysis," "on a claim of race-based peremptory challenges, compares the voir dire responses of the challenged prospective jurors with those of similar jurors who were not members of the challenged jurors' racial group, whom the prosecutor did not challenge." (*People v. Miles* (2020) 9 Cal.5th 513, 541.) Here, Beltcher's trial counsel did not engage in a comparative juror analysis. She argued generically that other jurors had said the system is unfair to people of color or is flawed. Where comparative analysis was not made below, " ' "the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges." ' " (*Ibid.*) In that instance, we " ' "must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." [Citation.] When a defendant asks for comparative juror analysis for the first time on appeal, we have held that "such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent." ' [Citation.] We have also held that under these circumstances, ' "a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors." ' " (*Ibid.*)

15

misdemeanor battery and one who had been convicted of a DUI. The People argue that other jurors' views of law enforcement and the criminal justice system were not similar to those A.B. had articulated. We agree with the People. A review of the comments Beltcher compares to A.B.'s does not show them to be so similar that the prosecutor's failure to strike these jurors demonstrates his reasons for challenging A.B. were pretextual.

For example, Beltcher compares A.B.'s comment that the criminal justice system is "[s]tructurally unfair towards people of color" to those made by a juror who stated, "I think I wish [the criminal justice system] was more or less directed at socioeconomic. I wish it was more fair the other way"; a juror who, when asked about her comment that her feelings about the criminal justice system were "positive yet skeptical," explained, "I wouldn't say—I couldn't say or be certain that everything is justifiable or people get justice, but I'm hoping it does more often than not"; and a juror who said the criminal justice system was "flawed, but decent." None of these jurors expressed views of the criminal justice system that were similar in strength or negativity to A.B.'s. Moreover, unlike A.B., none reported having been charged with a crime or having had "any particularly . . . unfavorable experience with any" law enforcement officer.

Similarly, the jurors whose comments Beltcher compares to A.B.'s statement that he had "[u]npleasant interactions w/police periodically" include a juror who commented that, in general she trusted that "the police are here to protect us," but indicated, after recounting her own positive experience with law enforcement (being stopped but not ticketed), that she believes "they treat people differently"; a juror who was convicted of misdemeanor battery and given probation who stated she felt she was treated fairly by law enforcement and the criminal justice system; a juror whose

father was a corrections officer and who had "generally pretty positive" feelings about law enforcement but acknowledged "they have a tough job and they probably don't treat everybody fairly"; a juror who was "ambivalent" about law enforcement because, "[j]ust from the media, I know that there's some bad apples, but that doesn't affect my opinion of other police officers who I have no information about yet"; and a juror who thought she was treated "a little unfair" by police who arrested her for DUI, for which she was convicted, and who was skeptical about police, but who otherwise thought she was treated fairly and was ashamed of what she had done. None of these jurors is comparable to A.B., who reported *periodic* unpleasant interactions with police, described his general feeling about law enforcement officers as "necessary, albeit unpleasant to deal with," and reported being charged with, and appearing in court on a charge of, disturbing the peace.

One juror cited by Beltcher requires a more extended discussion. Juror No. 9 reported in her questionnaire that she had no particularly unfavorable experiences with law enforcement officers, stated there are "good and bad" officers "in every city," and said she had "experienced racial profiling as a result of being married to an African American." Her younger brother, she said, "had drug charges and served 10 years in prison." She reported no feelings about the criminal justice system. She also reported being "very sensitive around criminal charges and sentencing" and said "[i]t was very difficult when my brother was in prison," though she did not "think that would impact my ability to be fair or impartial." In voir dire, the judge asked her whether, having sat through voir dire, it was still the case that she did not think the situation with her brother would impact her ability to be fair and impartial. She responded that her brother's case had been over for about

17

five years now and, "just with the limited information that I have so far," she could be fair and impartial.

When asked by the prosecutor whether she felt her brother had been treated fairly "kind of across the board, law enforcement, prosecution, sentencing, all of that?" she said "Law enforcement, I would say not so much, only because I happened to walk in during a raid to my mother's home and I've never experienced anything like that before. And just the behavior of the officers to me was very unprofessional and unethical. So not in that element, as far as prosecution. I wasn't involved. I didn't attend court, so I'm not quite sure." Her brother had "been in trouble with the law for most of his life and so unfortunately that spills over to the family."

She was equivocal whether her experience with police behaving unprofessionally with her and her mother would affect her listening to officers testify in this case, but ultimately thought she would be able to listen and "judge that police officer on whether they are telling the truth whether they behaved appropriately or respectfully without letting [her] experiences cloud [her] judgment." And she "absolutely would" let the judge know if at any point she realized that she was evaluating the officers' testimony unfairly because of her experiences. When asked about whether the racial profiling she and her husband had experienced would influence how she viewed the evidence, she said no, noting that she is "in HR" and "I deal with race every day."

Juror No. 9, it is fair to say, was similar to A.B. in that she had multiple negative interactions with police and a negative view of those interactions. A significant difference between her and A.B., however, was that she expressed no views about the criminal justice system, whereas A.B. stated it was structurally biased. Further, the prosecutor questioned Juror

18

No. 9 at some length and she was frank and forthcoming in her responses, unlike A.B., as we have already discussed. Given their differences, we cannot say that A.B.'s unfavorable view of law enforcement was so similar to Juror No. 9's that the prosecutor's failure to treat them the same demonstrates pretext.

Further, Beltcher's comparative juror analysis fails to offer any comparisons between A.B.'s tardiness and that of any other juror, even though A.B.'s tardiness was the prosecutor's primary reason for excusing A.B. Indeed, there is no indication in the record that *any* other juror failed to arrive on time for the proceedings. And while some jurors expressed concerns about law enforcement or the criminal justice system and two had prior convictions for relatively minor offenses, none held those views or had those experiences *combined with being tardy*.

These differences between A.B. and the unexcused jurors, especially his tardiness, are significant in our evaluation of Beltcher's comparative juror analysis. Our Supreme Court's opinion in *Hardy, supra,* 5 Cal.5th 56 is instructive. There, the defendant employed comparative juror analysis to claim the prosecutor's challenge to a juror was biased, arguing that "Some unexcused jurors shared some of the traits the prosecutor cited regarding [the challenged juror]." (*Id*. at p. 83.) Concluding the argument did not aid the defendant, the court observed, "But parties with limited peremptory challenges generally cannot excuse every potential juror who has any trait that is at all problematic. They must instead excuse those they believe will be most problematic under all the circumstances. There will always be some similarities between excused jurors and nonexcused jurors. Defendant cites no unexcused juror who exhibited the cynicism about prosecutors that this juror showed, or who had been mistakenly arrested for a crime and remained

19

ambivalent about it, or who had such close and continual professional contacts with attorneys and the court system that this juror had." (*Ibid.*) In another recent case, our Supreme Court put it this way: "Pretext is established, however, when the compared jurors have expressed 'a substantially similar *combination* of responses,' in all material respects, to the jurors excused. [Citation.] Although jurors need not be completely identical for a comparison to be probative [citation], 'they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 443.) Here, both because Beltcher's comparisons are wanting and because she fails to make any comparisons regarding A.B.'s significant tardiness, Beltcher's comparative juror analysis is unpersuasive.

A further reason for our affirmance is our deference to the trial court's finding that the prosecutor's motivations did not stem from racial bias. Beltcher argues we should not defer to the trial court's finding because, she contends, "[t]he trial court's terse motion-denial statement . . . does not reflect the required 'sincere and reasoned effort' to evaluate the prosecutor's reasons." She cites *People v. Mai* (2013) 57 Cal.4th 986 (*Mai*), in which the court stated, " ' "Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its

conclusions are entitled to deference on appeal.' " ' " (*Mai*, *supra*, 57 Cal.4th at pp. 1048-1049.) In the same opinion, the court rejected the argument Beltcher makes here, stating, "we have made clear that 'the trial court is not required to explain on the record its ruling on a *Batson/Wheeler* motion. [Citation.] "When the prosecutor's stated reasons . . . are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." [Citation.]' [Citation.] Here, as noted, the prosecutor's reasons were plausible and, in all essential respects, supported." (*Id*. at p. 1054; see also *id*. at p. 1049, fn. 26.) Although Beltcher argues the prosecutor's reasons for striking A.B. are implausible, we disagree and find they are plausible and supported by the record, including her primary concern about A.B.'s tardiness.[6] Thus, consistent with *Mai*, we defer

---

[6] Beltcher contends the Legislature's recent adoption of Assembly Bill No. 3070, which added section 231.7 to the Code of Civil Procedure to address use of peremptory challenges to exclude potential jurors on racial and other prohibited grounds, demonstrates that the prosecutor's secondary bases for excusing A.B. were pretextual. Although she concedes that this new provision does not apply to this case because it is expressly effective for jury trials in which jury selection begins on or after January 1, 2022 (Code Civ. Proc., § 231.7, subd. (i)), she argues that it supports her arguments about pretext. We are mindful of the concerns that led to the adoption of this legislation, including that racial minorities have disproportionately been excluded from serving as jurors and that certain reasons associated with minority groups have been used to achieve that result. (See *People v. Bryant* (2019) 40 Cal.App.5th 525, 546 (Humes, P.J., concurring).) The new statute does not preclude reliance on factors such as negative experiences with law enforcement or the criminal legal system and belief that the criminal laws have been enforced in a discriminatory manner altogether. (Code Civ. Proc., § 231.7, subd. (e).) But it makes those reasons presumptively invalid and imposes on the party asserting them a heavy burden to overcome the presumption. (*Ibid*. ["clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, . . . and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case"].) Salutary as this new

to the trial court's ultimate finding that the prosecutor was not motivated by race.

In short, we conclude that Beltcher's claim that the prosecutor violated her rights under *Batson-Wheeler* lacks merit.

## II.

### *The Trial Court's Decision Not to Give a Voluntary Intoxication Instruction*

Beltcher next argues the trial court erred when it refused her request that it give an instruction on voluntary intoxication based on her testimony that she smoked crack cocaine just before the incident and that this error deprived her of due process. The People contend no instruction was required because "there was no substantial evidence of either the *fact* of appellant's intoxication or of the *effect* that a 'hit' of crack cocaine had on the existence of a specific intent to kill." The People also argue that Beltcher's own testimony indicated her crack cocaine use did not prevent her from forming a specific intent to kill Myers. We agree with the People.

Beltcher cites section 29.4, which defines "[v]oluntary intoxication" as "the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance" (§ 29.4, subd. (c)), and provides:

"(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate

---

legislation is, the Legislature expressly made it prospective, and until it takes effect, we are not free to treat these reasons as presumptively pretextual. (See, e.g., *People v. Reed* (2018) 4 Cal.5th 989, 1001 [negative experiences with law enforcement or criminal justice system are race-neutral reasons for a strike]; *People v. Winbush, supra,* 2 Cal.5th at p. 439 [skepticism about fairness of criminal justice system to indigents and racial minorities are valid, race-neutral grounds for excusing juror].)

the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."[7]

As stated in *People v. Williams* (1997) 16 Cal.4th 635 (*Williams*), "A defendant is entitled to [an instruction on voluntary intoxication] only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*Id*. at p. 677.) In *Williams*, there was evidence that the defendant, charged with murder, was "doped up" and "smokin' pretty tough" at the time of the killings. (*Ibid*.) The court rejected the defendant's argument that the trial erred in refusing his requested instruction on voluntary intoxication because "there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent." (*Id*. at pp. 677-678.)

The trial court did not err in refusing the instruction because, while there was evidence that Beltcher smoked crack cocaine shortly before the shooting,[8] there was no evidence showing that drug use limited her ability to

---

[7] The parties debate whether voluntary intoxication is relevant to implied malice or only to express malice, both of which were included in instructions to the jury here. It appears that our Supreme Court resolved the matter in *People v. Soto* (2018) 4 Cal.5th 968, 975, 977-978, which neither party cites. In any event, we need not address this question, since the People do not dispute that voluntary intoxication is relevant to the express malice theory, which (along with an implied malice theory) was presented to the jury, and that the verdict did not specify which theory the jury adopted.

[8] We need not decide whether the evidence was sufficient to establish voluntary intoxication because, even if it did, the absence of evidence showing

23

form specific intent to kill. On the contrary, Beltcher's testimony in support of her claim that she shot Myers in self-defense undermined the idea that the high she experienced that night from smoking crack cocaine prevented her from forming a specific intent. She testified that after telling Myers to leave to no avail, she felt she was not posing a sufficient threat to make Myers want to leave, so she shot at the ground. When Myers then charged at her, Beltcher said, she shot again. She intended to get Myers away from her when she shot. She did not want to kill Myers and did not intend to shoot her in the back of the head, but she intended to defend herself and to get Myers away. She did intend to hit Myers with her second shot "to stop her coming towards me." In short, Beltcher's own testimony indicates she was acting intentionally at the time of the killing and the cocaine use did not preclude her from forming an intent. True, she claimed she did not intend to kill Myers or to shoot her in the head. But that disclaimer does nothing to show she did not form intentions and act in accord with those intentions. The trial court therefore did not err in deciding not to give the requested instruction.[9]

Beltcher's related claim that its failure to do so violated due process also lacks merit. (See *People v. Soto*, *supra*, 4 Cal.5th at pp. 980-981 [rejecting due process challenge to section 29.4's limitations on involuntary

___

it affected her ability to form specific intent justifies the trial court's refusal to give the instruction. (*Williams*, *supra*, 16 Cal.4th at pp. 677-678; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1181.)

[9] Beltcher also takes issue with the trial court's assertion that the instruction was not warranted because Beltcher was not offering expert testimony to prove the effect of her cocaine use. Assuming the trial court was incorrect, its ruling was not, for the reasons we have stated. We review the trial court's ruling, not its reasoning. (*People v. Turner* (2020) 10 Cal.5th 786, 807.)

intoxication to reduce culpability]; *People v. Berg* (2018) 23 Cal.App.5th 959, 969-970 [same].)

## III.

### *The Trial Court's Failure to Instruct on Involuntary Manslaughter*

The jury was instructed on first and second degree murder and voluntary manslaughter. To convict Beltcher of any of these offenses, the jury was required to find she acted with express or implied malice and without lawful justification, which in turn required it to reject her claim of self-defense or imperfect self-defense. The voluntary manslaughter instruction stated that a killing that would otherwise be murder is reduced to voluntary manslaughter if (1) the defendant killed someone because of a sudden quarrel or in the heat of passion, or (2) the defendant killed a person because she acted in imperfect self-defense.

Beltcher argues the trial court erred by failing to give an instruction, not requested by her trial counsel, on *in*voluntary manslaughter. She relies on *People v. Brothers* (2015) 236 Cal.App.4th 24 (*Brothers*), an opinion written by Justice Perluss in the Second District that addresses when a trial court must instruct, sua sponte, on involuntary manslaughter. We conclude the trial court did not err.

As a general matter, " ' "[t]he trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." [Citations.] "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." [Citations.]' [Citations.] 'Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense. . . ." [Citation.] Such

25

instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.' " (*People v. Whalen* (2013) 56 Cal.4th 1, 68, disapproved on other grounds by *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.)

"The duty exists even when the lesser included offense is inconsistent with the defendant's own theory of the case and the defendant objects to the instruction. [Citations.] This instructional requirement ' "prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' " ' " (*Brothers*, *supra*, 236 Cal.App.4th at pp. 29-30.)

Our review of a trial court's failure to instruct on a lesser included defense is de novo. (*Brothers*, *supra*, 236 Cal.App.4th at p. 30.)

In *Brothers*, as here, the question was whether the trial court erred in failing to instruct the jury on involuntary manslaughter in a case in which the jury was instructed on both murder and voluntary manslaughter. (See *Brothers*, *supra*, 236 Cal.App.4th at p. 29.) As Justice Perluss there explained,

"Both voluntary and involuntary manslaughter are lesser included offenses of murder. [Citation.] When a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, [imperfect self-defense], the malice element is 'negated' or, as some have

26

described, 'mitigated'; and the resulting crime is voluntary manslaughter, a lesser included offense of murder.  [Citations.]

"Involuntary manslaughter, in contrast, [is the] unlawful killing of a human being without malice.  (§ 192.)  It is statutorily defined as a killing occurring during the commission of 'an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection.'  (§ 192, subd. (b).)  Although the statutory language appears to exclude killings committed in the course of a felony, the Supreme Court has interpreted section 192 broadly to encompass an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection."  (*Brothers*, *supra*, 236 Cal.App.4th at pp. 30-31.)

*Brothers* concluded that a killing in the course of an inherently dangerous assaultive felony, if done without malice, is also involuntary manslaughter.  (*Brothers*, *supra*, 236 Cal.App.4th at pp. 33-34.)

Beltcher contends there is substantial evidence to warrant an involuntary manslaughter instruction under the theory that she committed an inherently dangerous assaultive felony and did so without malice.  She cites her own testimony that the killing was an accident, that she did not intend to kill Myers, that she shot "blindly" and that she was not being careful when she shot.  Based on this testimony, she argues the jury could have found her guilty of the lesser offense of involuntary manslaughter "even though it had rejected the heat of passion and imperfect self-defense theories as to manslaughter."  We disagree.

In *Brothers*, the defendant similarly claimed an involuntary manslaughter instruction should have been given based on her testimony that "she did not know 'this was going to happen.' "  (*Brothers*, *supra*,

27

236 Cal.App.4th at p. 34.) Assuming she meant by this that she did not intend to kill the victim, the court rejected the argument, observing that "intent to kill is an element of express, not implied, malice. As discussed, malice is implied when the defendant engages in an act the natural consequences of which are dangerous to life and acts with conscious disregard for human life. [Citation.] Even crediting Brothers's testimony in its entirety, there was simply no evidence from which a reasonable juror could entertain a reasonable doubt that Brothers had acted in conscious disregard of the risk her conduct posed to Gates's life. Brothers's own account unequivocally established she engaged in a deliberate and deadly assault because she had been enraged, 'out of control,' and unable to calm herself." (*Brothers*, *supra*, 236 Cal.App.4th at pp. 34-35.)

Although the circumstances of the killing here are different from those in *Brothers*, we reach the same conclusion. Beltcher admitted she fired the gun two times, and possibly three. She intentionally pointed the gun at, and fired at, Myers, who was close to the screen door of the trailer, and Beltcher was inside the trailer, had moved closer to the door, and was aiming through a part of the door that doesn't have a screen. After she shot at the ground, Myers came toward the door, and she shot again. She shot at Myers on purpose, intentionally pulled the trigger and pointed the gun at Myers when she pulled the trigger, and she did this more than once. When asked if she meant to shoot Myers in the arm, Beltcher testified, "I just shot. If it hit her, it hit her. It hit her in the arm, I don't know." When she shot, "[Myers] was coming straight towards me." She may have accidentally shot Myers in the back of the head. She knew that shooting her could kill her. You could say she was just blindly shooting.

28

Crediting Beltcher's own account of what happened, no juror who rejected Beltcher's self-defense arguments could entertain a reasonable doubt that she acted with implied malice. To be sure, her statements that it was an accident, and that she was not being careful, shot blindly and did not intend to kill Myers could support a finding that she lacked *express* malice. But her specific testimony that she deliberately pointed the gun at Myers and shot at her from close range, knowing she could kill her by doing so, leaves no room for reasonable doubt that she acted in conscious disregard of the risk she posed to Myers's life. Thus, the trial court did not err in failing to instruct on involuntary manslaughter.

## IV.

### *Fines and Fees Imposed by the Trial Court*

Beltcher also challenges the trial court's imposition of an $80 court operations fee under section 1465.8; a $60 court facilities fee under Government Code section 70373; and both a $5,000 restitution fine under section 1202.4 and a $5,000 parole revocation fine under section 1202.45, which were above the minimum amounts that could have been imposed under those two statutes. Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), she contends the court fees should not have been imposed without a finding of her ability to pay and that the restitution fine should have been stayed.[10] We conclude Beltcher has forfeited these appellate claims.

"In *Dueñas, supra*, 30 Cal.App.5th 1157, [Division Seven of the Second District] held it violated due process under both the United States and California Constitutions to impose a court operations assessment as required

___

[10] The parole revocation fine was stayed pending successful completion of parole.

29

by Penal Code section 1465.8 or the court facilities assessment mandated by Government Code section 70373, neither of which is intended to be punitive in nature, without first determining the convicted defendant's ability to pay. (*Dueñas*, at p. 1168.)  A restitution fine under Penal Code section 1202.4, subdivision (b), in contrast, is intended to be, and is recognized as, additional punishment for a crime.  Penal Code section 1202.4, subdivision (c), provides a defendant's inability to pay may not be considered a compelling and extraordinary reason not to impose the restitution fine; inability to pay may be considered only when increasing the amount of the restitution fine above the minimum required by statute.  To avoid the serious constitutional question raised by these provisions, [the *Dueñas* court] held, although the trial court is required to impose a restitution fine, the court must stay execution of the fine until it is determined the defendant has the ability to pay the fine.  (*Dueñas*, at p. 1172.)" (*People v. Castellano* (2019) 33 Cal.App.5th 485, 488-489.)

The People argue that Beltcher forfeited her challenges to the fees because she did not raise the *Dueñas* inability-to-pay issue in the trial court, either in her sentencing memoranda or at the hearing.[11]

The People also argue that Beltcher's challenge to the restitution fine and the conditional parole revocation fine are "doubly forfeited" because Beltcher could have, but did not, raise her inability to pay them under the

_____

[11]  *Dueñas* was decided on January 8, 2019.  The sentencing hearing in this case was held on April 12, 2019, three months after *Dueñas* was decided. The People persuasively argue that since Beltcher's sentencing occurred after *Dueñas* was decided, it is distinguishable from cases like *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 and *People v. Castellano*, *supra*, 33 Cal.App.5th at pp. 488-489), which forgave the failure to raise the ability-to-pay issue in the trial courts on the ground that the ruling in *Dueñas* was not foreseeable.

statute governing restitution fines. A restitution fine is "set at the discretion of the court and commensurate with the seriousness of the offense," and it is paid into a state fund used to compensate victims." (*People v. Brooks* (2018) 23 Cal.App.5th 932, 939.)

" 'Section 1202.4, subdivision (c), specifies a defendant's inability to pay is not a compelling and extraordinary reason to refuse to impose the fine, but inability to pay 'may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [of $ 300].' . . . Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.) A defendant's failure to do so forfeits any "inability to pay" appellate claim, which rule has even been applied to fines beyond the statutory minimum that were imposed by trial courts before *Dueñas* was decided. (See *People v. Frandsen*, at pp. 1153-1155; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1034 [by failing to object and argue he was unable to pay restitution fine that was far beyond the statutory minimum, defendant forfeited argument that court's failure to consider ability to pay violated his constitutional rights and left no doubt he would he would not have challenged lower court funding assessments even if he had known of right later established in *Dueñas*]; *People v. Smith* (2020) 46 Cal.App.5th 375, 395 [defendant forfeited challenge to assessments and fines because he failed to object in the trial court on the ground that he was unable to pay, even though trial court imposed a $10,000 statutory maximum restitution fine]; but see *People v. Taylor* (2019) 43 Cal.App.5th 390, 400-401 [defendant did not forfeit *Dueñas* challenge to the court operations and facilities assessments, even though he did not object to the maximum $10,000

31

restitution fine, because the "defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum"].)

"In setting the amount of the [restitution] fine pursuant to [section 1202.4,] subdivision (b) in excess of the minimum fine pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime." (§ 1202.4, subd. (d).) The parole revocation fine must be set in the same amount as the restitution fine. (§ 1202.45, subd. (a).)

Under section 1202.45, subdivision (b), if Beltcher had argued in the trial court that the restitution and parole revocation fines should be reduced because she was unable to pay the $5,000 restitution fine, the court could have considered whether to reduce the amount, which would in turn have reduced the matching parole revocation fine. She did not assert she was unable to pay, resulting in her forfeiture of her claims about these fines.

In short, we conclude that Beltcher forfeited her *Dueñas* challenges to the assessments and the fines by failing to raise them in the trial court. We therefore do not address the merits of those claims.

## V.

### *The Trial Court's Denial of a Surrebuttal Closing Argument*

Finally, Beltcher argues the trial court abused its discretion and violated her federal and state constitutional rights to "due process, a fair trial, effective assistance of counsel and fundamental fairness" in denying her

request that her counsel be allowed to make a brief surrebuttal closing argument upon the commencement of proceedings after a three-day weekend, before which the prosecutor had presented most of her rebuttal argument. Once more, we disagree.

Beltcher relies on *Herring v. New York* (1975) 422 U.S. 853 (*Herring*), in which the Supreme Court held that the complete denial of closing argument to a criminal defendant in a bench trial deprived him of the constitutional right to assistance of counsel. (*Id.* at pp. 864-865.) As the high court recognized in that case, "closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial" and "a total denial of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense." (*Id.* at pp. 858-859.) The court went so far as to state, "no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." (*Id.* at p. 862.)

Nonetheless, *Herring* does not in any way suggest the right to closing argument is unlimited. As the court there observed, "This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion." (*Herring*, *supra*, 422 U.S. at p. 862.)

As a matter of statute in California, both parties have the right to "argue the case to the court and jury; the district attorney, or other counsel

for the people, opening the argument and having the right to close." (§ 1093, subd. (e).) That is the "customary procedure" in trials on the issue of guilt (*People v. Corwin* (1959) 52 Cal.2d 404, 407; *People v. Gonzalez* (1961) 56 Cal.2d 317, 319), and it has been embedded in section 1093 since at least 1919. (See *People v. Martin* (1919) 44 Cal.App. 45, 47 [section 1993, subd. 5 gives district attorney the right to close].) It is justified because the prosecutor bears the burden of proving guilty beyond a reasonable doubt on the issue of guilt. (*People v. Bandhauer* (1967) 66 Cal.2d 524, 530-531.) Section 1094 gives trial courts discretion to depart from this procedure "for good reasons." We review trial court decisions allowing or denying such departures for abuse of discretion. (See *People v. Moore* (2016) 6 Cal.App.5th 73, 97; *People v. Frazier* (1948) 88 Cal.App.2d 99, 105-106.)

Here, the prosecutor gave her initial closing argument on the afternoon of Wednesday, February 20, 2019. The trial recessed until the following afternoon, Thursday, February 21, 2019, at which time defense counsel gave her closing argument. After she concluded, the prosecutor gave most of her rebuttal. The court was then in recess over a three-day weekend, and proceedings resumed on Monday morning, February 25, 2019. The prosecutor promptly completed her rebuttal, and the court instructed the jury. The jury then retired to the jury room to commence deliberations, and returned their verdict later that day.

At the outset of the final day, before the prosecutor resumed her rebuttal, defense counsel requested that the court allow her to present a brief surrebuttal. Her basis was not entirely clear. She said: "The prosecution did the rebuttal the end of Thursday. She spoke for about 40 minutes. And then went into this week after three days of preparation time. And I don't know how long she's going to continue going. She indicated about 30 minutes on

Friday. Although, I don't know if that's accurate or not, but I'm just asking the Court for a very brief rebuttal period." The trial court recognized it had discretion but found the defense was not "substantially prejudiced under the circumstances," and so denied the request.

On appeal, Beltcher claims that adjourning the case for a three-day weekend after jurors heard most of the prosecution's rebuttal allowed them to contemplate the prosecution's argument for "an extended period," and that to deny the defense some argument in response after such a break was unfair and violated her constitutional rights. The effect, she says, was to "firmly fix[] the prosecutor's version of the case in the jurors' minds over the weekend and made it extremely difficult, if not impossible, for the jury to objectively weigh the evidence and consider the arguments." Beltcher urges us to hold, as a matter of law, that a trial court should never permit a jury to consider a prosecutor's argument over a weekend without giving the defense an opportunity to respond.

We are not persuaded. The recess at the end of the day on Thursday for the three-day weekend was preceded by a full afternoon of argument. Defense counsel made her closing argument for a little over two hours. This was followed by 45 minutes of rebuttal argument by the prosecutor. In other words, the jurors heard more than twice as much argument that afternoon from the defense as they heard from the prosecutor. If jurors spent any part of the weekend thinking about the case, they did so having just heard from *both* sides. There is no reason to think jurors would have remembered or considered only the 45-minute rebuttal by the prosecutor and forgotten or ignored the two-hour closing argument made by defense on the same pre-recess afternoon. Any advantage the prosecutor may have gained from having the last word was the same advantage she would have had if no

35

weekend had intervened between closing arguments and deliberations—the advantage afforded to the prosecutor of presenting rebuttal as a matter of customary and statutory procedure.  Moreover, as the People point out, a prosecutor's rebuttal argument may "carr[y] a greater impact when the jurors immediately commence deliberations with the argument fresh in their minds . . . than when there has been a prolonged period of time for them to forget the argument."

Just before adjourning for the weekend, the trial court instructed the jury not to "discuss the case or form or express any opinion about it."  The trial court could presume the jury followed this instruction.  The trial court considered the defense request for a second argument but exercised its discretion to deny it after finding the defense was not prejudiced by the circumstances.  The trial court is in the best position to assess whether any circumstances at a trial result in unfairness.  Here it concluded they did not.  Beltcher has not persuaded us that it abused its discretion.  (Cf. *People v. Moore* (2016) 6 Cal.App.5th 73, 97 [fact that prosecutor chose to highlight damaging evidence only on rebuttal did not require trial court to grant defense request for surrebuttal, and denial of request was not abuse of discretion].)

For the same reasons, Beltcher's constitutional arguments have no legs.  There was nothing fundamentally unfair in this case about the trial court decision to follow the order of arguments set forth in section 1093 rather than departing from that order.  (See *People v. Cory* (1984) 157 Cal.App.3d 1094, 1105 [rejecting defense claim that second opportunity to make closing argument was required by due process].)

## DISPOSITION

The judgment is affirmed.

 
                                  _____

STEWART, J.

We concur.


_____

KLINE, P.J.


_____

MILLER, J.

*People v. Beltcher* (A157083)